## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SHEKETHA HOLMAN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-2110 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of the denial of Social Security benefits, Plaintiff Sheketha Holman brought this action pursuant to 42 U.S.C. § 405(g) for review of the final determination by Social Security Administrator Michael J. Astrue ("Commissioner") that she is not entitled to receive benefits under Title II and XVI of the Social Security Act, 42 U.S.C. § 1382. Before this Court is Holman's Brief (Dkt. 16), and the Commissioner's Motion for Summary Judgment (Dkt. 17). Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the court **denies** the Plaintiff's motion and **grants** summary judgment for Defendant.

### BACKGROUND

Holman is a 31-year old woman with a ninth-grade education, who alleges that she became disabled on June 1, 2006. Her past relevant work is as a fast food worker and as a cashier. Holman is five feet, five inches tall, and weighs 275 pounds.

Medical records submitted to support Holman's claim reveal that she has regularly sought emergency medical attention for a wide range of medical complaints.

Most significantly, Holman suffers from degenerative disc disease of the cervical and lumbar spine; obesity; asthma; diabetes mellitus; recurrent migraine headaches; obstructive sleep apnea; and anxiety.  In addition, Holman has been diagnosed as anemic and hypothyroid, and as having mild gastroesophageal reflux disease.[1]

### *Holman's Shoulder Injury*

On June 8, 2006, Holman was injured while working as a cashier at Wal-mart. Holman attempted to catch a falling 24-pack of soft drinks, injuring her right hand, arm and shoulder.  The next day, Holman sought treatment at Conroe Emergency Medical Center, where she was diagnosed with a sprained shoulder and muscle strain.[2]  She was prescribed pain medication, given a sling and cleared to return to work doing only left-handed jobs.[3]  Three days later, Holman sought treatment from Dr. Todd Custer, a chiropractor.  Dr. Custer examined Holman and reviewed x-rays of her spine.  No soft tissue abnormalities were noted in the x-rays.[4]  Holman underwent an MRI on June 26, 2006, which revealed that her rotator cuff was not torn, and "no anatomical abnormality of the right shoulder can be identified."[5]  On June 28, 2006, Dr. Custer cleared Holman to return to work at Wal-mart, with the limitation of lifting 10 pounds or less.[6]

Shortly after being cleared to return to work, Holman again saw Dr. Custer—this time stating that the pain in her right arm and neck had increased and that her workload

---

[1] Tr. 330, 434.
[2] Tr. 922.
[3] Tr. 920.
[4] Tr. 801.
[5] Tr. 687.
[6] Tr. 777.

of folding and hanging clothes at Wal-mart had exacerbated her condition.[7]  She also reported "having an increase in headaches with the work duties."[8]  Upon examination, Dr. Custer noted that she had a decreased range of motion and he reported some "noticeable swelling," based upon his measurement that her right forearm was 1 centimeter larger than her left forearm.[9]  Dr. Custer therefore removed his clearance for Holman to work, and ordered further diagnostic testing.[10]  At the next examination, Dr. Custer stated that Holman had a full range of motion, but pain when she elevated her right arm over 90 degrees.  He also noted that she did not complain of any sensory loss.[11]

On June 27, 2006, Holman was examined by Dr. Cynthia Sloan, a neurologist.  Dr. Sloan's report notes that Holman's examination was normal in many respects, but that it was possible Holman was suffering from a pinched nerve because "cervical paraspinal testing was suggestive for radiculopathy involving the C5, C6 and to a lesser extent, the C7 nerve roots on the right.  Clinical and radiographic correlation is advised."[12]  An MRI conducted shortly thereafter noted "very minimal bulging" of Holman's C4-C5 and C5-C6 discs but noted that there was "no impingement on the emanating nerve roots or central stenosis."[13]  Dr. Sloan prescribed pain medications, which Holman complained made her sleepy.

---

[7] Tr. 767.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Tr. 753.
[12] Tr. 665
[13] Tr. 649.

On September 7, 2006, Dr. Custer again cleared Holman to return to work at Wal-mart, on "light duty status," noting that she was limited to lifting no greater than five pounds and was restricted from overhead lifting. Holman was also "reminded of the necessity of active exercise in the healing process and recommended to work through some moderate discomfort and to expect an increase in discomfort with the increased demands."[14]

Four days later, on September 12, 2006, Holman sought treatment at The Woodlands Hospital emergency room for an accidental overdose of Excedrin, stating she had returned to work that day and taken six Excedrin over 4 hours in an attempt to relieve the resulting neck pain.[15] After treatment and observation, The Woodlands Hospital discharged Holman, stating that she was able to return to work in two days.[16]

The next day, however, Holman again returned to Dr. Custer. Holman reported to Dr. Custer that she had not been returned to a telephone position at Wal-mart as she had expected, but she had been instead asked to hang and fold clothes.[17] Accordingly, Dr. Custer ordered that she be held off work until she received steroid injections and further treatment.[18]

On December 7, 2006, Holman received corticosteroid injections in her neck from Dr. Alan Moore, and afterwards reported an intense burning and itching in her neck, as

---

[14] Tr. 731.
[15] Tr. 329.
[16] Tr. 721.
[17] Tr. 709.
[18] Id.

4

well as balance issues and weakness in her legs.[19]  She was tested for meningitis by a CT scan of the head and a lumbar puncture, which was negative.[20]  She again sought emergency treatment at The Woodlands Hospital as a result of her continued pain, and she was again diagnosed with a possible cervical radiculopathy (pinched nerve) and prescribed Valium.[21]

On a follow-up visit with Dr. Custer, on January 9, 2007, he noted that Holman continued to report neck pain but that she displayed a normal range of motion.[22]  Dr. Custer recommended additional injections and treatment.[23]

### Independent Medical Examinations

On December 5, 2006, Holman was evaluated by Dr. Durga Sunkara for an independent medical examination.  Dr. Sunkara noted that Holman was five foot five inches, and weighed 298 pounds.  According to Dr. Sunkara's report, Holman displayed a normal range of movement, was able to get up and down from the examination table and remove her shoes without difficulty, and retained normal grip strength in both hands.[24]  Dr. Sunkara did not observe any swelling or atrophy in Holman's extremities and noted that "[s]he is able to bend, pick up socks from floor and wear them, she is able to tie shoe laces."[25] An x-ray of Holman's spine was reported as "normal."[26]  Dr. Sunkara concluded that Holman "was able to sit, stand and move about. . . . She has back pain but no loss of

---

[19] Tr. 553.
[20] Tr. 348.
[21] Tr. 405.
[22] Tr. 545.
[23] *Id.*
[24] Tr. 471-474.
[25] Tr. 474.
[26] Tr. 474.

motion, spasm, atrophy, motor or sensory changes or reflex abnormalities. . . . Her grip strength is 5/5 and her ability to reach, handle, finder and feel are preserved."[27]

A functional capacity evaluation was performed on January 8, 2007. It concluded that Holman was functioned at a "sedentary demand level."[28] After this assessment, Holman saw Dr. Martin Steiner, another independent medical examiner. Dr. Steiner evaluated Holman and reported that her functional capacity evaluation revealed "several inconsistencies, which would be indicative of symptom magnification."[29] Dr. Steiner found that Holman displayed only subjective symptoms of pain and discomfort in her right upper extremities, and that these complaints were not supported by any objective abnormalities.[30] As part of his report. Dr. Steiner reviewed the MRI of Holman's shoulder from August 2006. He concluded, "On the basis that Sheketha Holman has no evidence of any objective abnormalities, I see no reason why she cannot return to full-work duty immediately. She does not require any additional chiropractic therapy, injection therapy, or prescription medications."[31]

In February 2007, Holman was also evaluated by Dr. Norberto Poquiz, a professional medical examiner. Dr. Poquiz reviewed the notes of Dr. Custer, and Dr. Sloan, Dr. Moore as well as the MRI results, x-rays and other tests conducted between June 2006 and January 2007. Dr. Poquiz also reviewed Dr. Steiner's report and the functional capacity evaluation report. Dr. Poquiz's examination of Holman led him to

---

[27] Tr. 474.
[28] Tr. 522.
[29] Tr. 541.
[30] *Id.*
[31] Tr. 543.

conclude that she had a limited range of motion in her right shoulder, leading to a total impairment of 13%.[32]

### *Holman's Application for Benefits and ALJ Hearing*

Holman applied for disability on applied for benefits on October 16, 2006.  Her applications were initially denied on January 31, 2007, and again upon reconsideration on May 7, 2007.  An administrative hearing was held on November 5, 2008, at which both Holman and a vocational expert testified.

At the hearing, Holman testified that she experienced shortness of breath and anxiety, blurred vision, migraines, neck pain, swelling in her legs and feet, numbness in her hands and feet, nausea, diabetes and sleep apnea.[33]  Holman stated she suffered from three to four migraines a week.[34]  Holman admitted to knowing that she needed to lose weight, but stated that her hypothyroidism prevented her from doing so.[35]  She stated that she was not able to stand or sit for long periods of time, and that she was sleepy during the day.[36]  Holman testified that the swelling in her legs and feet is sometimes so extreme that she cannot wear closed shoes.[37]  While working at Wal-mart, Holman testified that she experienced anxiety attacks and asthma attacks, causing her to pass out.[38]

---

[32] Tr. 527.
[33] Tr. 45, 47, 67, 68.
[34] Tr. 62.
[35] Tr. 60.
[36] Tr. 45, 53, 70.
[37] Tr. 57.
[38] Tr. 55.

After injuring her shoulder at Wal-mart, Holman testified that she worked for three weeks cleaning rooms at Woodland Manor, a nursing home.[39]  She stated that she was unable to keep working at that job, however, because the cart of janitorial supplies was too heavy for her to manage.[40]  Holman testified that doctors had recommended she receive additional steroid injections for her neck and back pain but she refused this treatment because she was "so scared from the [side effects of the] first one".[41]

Holman stated that she was able to lift five to seven pounds, and walk to her mailbox.[42]  Holman has a driver's license and drives a car regularly.  She is sometimes able to walk around Wal-mart while shopping.[43]  Holman is also able to care for her 10-year old daughter and help her daughter with her homework.  In addition, Holman stated that she was able to clean her house, including making the bed and folding clothes, although her daughter or another family member mops, vacuums and does the dishes.[44]

The vocational expert testified that a hypothetical individual with a marginal ninth grade education and Holman's past relevant work, who had a physical RFC for light work with additional physical limitations and a mental RFC "to perform a full range of simple repetitive tasks on a consistent basis", would be able to work as a fast food worker and as a cashier, checker but not as a janitor.[45]  The vocational expert also testified that

---

[39] Tr. 64, 72.
[40] Tr. 54.
[41] Tr. 71.
[42] Tr. 61.
[43] *Id.*
[44] Tr. 59.
[45] Tr. 73.

the job of fast food worker is classified as light, unskilled work and a cashier, checker is light, semi-skilled work.

### ALJ's Opinion

On January 15, 2009, the administrative law judge ("ALJ") found that Holman was not disabled from June 1, 2006 through the date of the decision, and thus she was not entitled to receive benefits.[46] The ALJ's decision found that Holman had not engaged in substantial gainful activity since her alleged onset date of June 1, 2006.  The ALJ also found that Holman suffered from the following severe impairments:  degenerative disc disease of the cervical and lumbar spine; obesity; asthma; diabetes mellitus; recurrent migraine headaches; obstructive sleep apnea; and anxiety.   The ALJ found these impairments, however, did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ held that Holman had the residual functional capacity ("RFC") to perform light work, with some additional limitations.  The limitations imposed by the ALJ include physical limitations as well as avoiding exposure to extremes of temperature, wetness, humidity and avoiding odors, fumes, and gases.[47]  The ALJ also held that Holman had "the ability to perform [the] full range of simple, repetitive tasks on a consistent basis".[48]  The ALJ concluded the analysis of Holman's RFC by noting

---

[46]    The ALJ found that Holman was covered through March 21, 2008, and that she was required to establish disability on or before that date to be entitled to any disability insurance benefits.  That finding has not been challenged.

[47] Tr. 26.

[48] *Id.*

Based on the entire record, [Holman] is found to possess certain mental and physical functional limitations related to her combination of impairments. The objective medical evidence does not, however, support the severity and/or types of symptoms asserted by [Holman]. Again, the evidence supports that [Holman's] neck and shoulder strain improved quickly and significantly after her June 2006 injury. . . . . I find that [Holman's] assertions relative to symptomatology, pain, functional limitations and restrictions on activities of daily living are not credible in that they are exaggerated, lack corroboration or substantiation in the medical evidence, and are at least partially the result of the failure to follow prescribed medication and/or treatment recommendations.[49]

Based on this RFC, the ALJ held that Holman was capable of performing her past relevant work as a fast food worker and cashier/checker[50]. Accordingly, the ALJ held that Holman was not disabled as of June 1, 2006.

## I.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if it could affect the outcome of the action. A dispute as

---

[49] Tr. 35.
[50] *Id.*

to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## II.   STANDARD OF REVIEW

When judicially reviewing a determination that an applicant is not entitled to benefits, we determine "(1) whether the Commissioner applied the proper legal standard; and (2) whether the Commissioner's decision is supported by substantial evidence." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *see also* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, less than a preponderance, and is such that relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021–22 (5th Cir. 1990). A finding of no substantial evidence is warranted only "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (internal quotation marks and citation omitted). The court may not re-weigh the evidence in the record, nor try the issues de novo, nor substitute the court's judgment for the Commissioner's, even if the evidence preponderates against the Commissioner's decision. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

## III.   ANALYSIS

### A.   Statutory Basis for Benefits

Holman applied for both Social Security disability insurance and Supplemental Security Income (SSI) benefits. Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program

provides insurance to individuals who are forced into involuntary, premature retirement, provided they are both insured *and* disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

SSI benefits are authorized by Title XVI of the Social Security Act, and provide an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. 20 C.F.R. § 416.110. Eligibility for SSI is based on proof of disability and indigence. *See* 42 U.S.C. § 1382c(a)(3) (definition of disability); 42 U.S.C. § 1382(a) (financial requirements). Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act. *See* 42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382c(3)(A) (SSI). The law and regulations governing the determination of disability are the same for both programs. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### B.     Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A "physical or mental impairment" is an anatomical physiological or psychological abnormality

demonstrable by acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D).

A disability claim is examined in a five-step sequential analysis to determine whether "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007). If, at any step, the claimant is determined to be disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform.  *Id.*  The Commissioner's analysis at steps four and five is based on the assessment of the claimant's RFC, or the work a claimant can still do despite his or her physical and mental limitations.  *Perez v. Barnhart*, 415 F.3d 457, 461–62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945. The Commissioner assesses the RFC before proceeding from step three to four.  *Id.*  Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut this finding.  *Id.*

### C.    Holman's Cervical Impairments

Holman contends that the ALJ erred in finding that her cervical disc disease did not equal a listed impairment.  Holman first bases this contention on the fact that the ALJ

noted she suffered from severe degenerative disc disease, and her medical records reflect a "herniated nucleus pulposus at the C5-C6 level of the cervical spine", a condition she argues is "frequently associated with the impingement of a nerve root."  Further, she points out that Dr. Sloan, a neurologist, stated Holman's test results were "suggestive for radiculopathy involving the C5, C6 and 'to a lesser extent,' the C7 nerve roots on the right."  Holman points to her August 17, 2006 MRI, which revealed a bulging disc and disc protrusion, and to notes from December 15, 2006 stating that she suffers from "neck pain, cervical radiculopathy, paresthesia and a herniated cervical disc."

Listing 1.04A addresses disorders of the spine (such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture) resulting in compromise of a nerve root or the spinal cord, with:

> A. *Evidence of nerve root compression* characterized by *neuroanatomic distribution of pain*, *limitation of motion of the spine*, *motor loss* (atrophy with associated muscle weakness or muscle weakness) *accompanied by sensory or reflex loss and*, if there is involvement of the lower back, *positive straight-leg raising test* (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A (emphasis added).   The ALJ gave this listing "particular consideration" in the opinion, noting that Holman had in fact been "diagnosed through MRI with degenerative disc disease of the cervical spine, with allegedly associated symptoms of right shoulder pain and right hand and arm pain, numbness and weakness."  The ALJ further noted that "[Holman] asserts difficulty with ambulation secondary to low back pain and the affects of diabetes."  However, the ALJ concluded that "[t]he balance of the medical evidence . . . simply does not support the

14

existence of the severity of symptoms or limitations asserted by the claimant." Further, the ALJ concluded that "[i]n the absence of consistently documented neurological deficits, such as muscle weakness or sensory loss, [Holman] cannot be found to meet the specific criteria of medical listing 1.04A".[51]

Holman argues that the evidence establishes she meets the initial requirement of Listing 1.04A—a "disorder of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord." Further, she argues that she satisfies the secondary requirements of Listing 1.04A because medical evidence reflects she has a limited range of motion in her cervical spine. She points to the February 2007 exam in which Dr. Norberto Poquiz noted a decreased range of motion. She also alleges that her records reflect "motor loss", i.e., muscle weakness, accompanied by sensory or reflex loss. Holman contends that this evidence is sufficient to meet the listing, and that the ALJ's requirement of "consistently documented neurological deficits, such as muscle weakness or sensory loss" to satisfy is legal error.

Even if Holman did satisfy the initial requirement of Listing 1.04A, a "disorder of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord,"[52] the evidence submitted does not satisfy the secondary requirements. The evidence to satisfy these secondary requirements must be reported in "a detailed description of the . . . findings appropriate to the specific impairment being evaluated [and] must be determined

---

[51] Tr. 24.

[52]      The Commissioner contends that Holman, in fact, does not satisfy this requirement because the August 2006 MRI report in the record states that there was "no impingement on the emanating nerve roots or central stenosis." (Tr. 649).

15

on the basis of objective observation during the examination and not simply a report of the individual's allegation." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."). Similarly, Listing 1.00H, in addressing the general evaluation of disorders of the musculoskeletal system (including disorders under Listing 1.04A) states, "a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment unless the claim can be decided favorably on the basis of the current evidence." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00H.   Thus, it was not error for the ALJ to require a history of objective medical documentation showing that—over the period of relevant time—Holman consistently experienced neurological deficits, such as muscle weakness or sensory loss, as a result of her cervical radiculopathy.

The record reveals that, although Holman did display some muscle weakness and alleged sensory loss on her right side during some of her exams, at other times her muscle strength and grip strength was noted as equal on both sides.   For example, Dr. Custer's own notes show that Holman's condition varied during her many visits with him, noting that on at least one occasion she had a full range of motion and no sensory loss.[53]   In addition, Dr. Sunkara concluded that Holman had "no loss of motion, spasm, atrophy, motor or sensory changes or reflex abnormalities. . . . Her grip strength is 5/5 and her ability to reach, handle, finder and feel are preserved."[54]   The ALJ's holding that Holman

---

[53] Tr. 753.
[54] Tr. 474.

did not satisfy the requirements of Listing 1.04A is therefore supported by substantial evidence. Holman's motion for summary judgment on this ground is denied.

### D.    Holman's Ability to Perform Past Relevant Work

Holman next complains that the ALJ erred by finding that she retained the ability to perform her past relevant work as a fast food worker and cashier/checker.  Essentially, Holman complains that the ALJ's finding that her RFC limited her to repetitive work conflicts with the ALJ's finding that she could perform her past work as a fast food worker, because there was no testimony by the vocational expert that her past work as a fast food worker was "repetitive."  Similarly, Holman argues that the ALJ's finding that she could perform her past relevant work as a cashier/checker is in error because that job is "semi-skilled" in nature and the ALJ found that Holman's RFC limits her to "unskilled" work.

As to Holman's first complaint—that neither the Dictionary of Occupational Titles ("DOT") nor that the vocational expert's testimony state that the job of fast food worker is "repetitive" and thus the ALJ's finding that Holman can perform this job conflicts with the ALJ's finding that Holman's  RFC limits her to "repetitive"  tasks—the Court disagrees.   The ALJ specifically included the limitation of "routine" tasks in the hypothetical to the vocational expert, and the vocational expert's answer evidences his opinions that the job is one a person limited to "routine" tasks can perform:

> [ALJ]:  Okay.  Ninth grade marginal education and past relevant work as you had described with the residual functional capacity to perform light work with the following postural limitations. . . . And has the ability to perform the full range of simple, repetitive tasks on a consistent basis.

With that residual functional capacity, would the claimant be able to perform the past relevant work?

[VE]: As defined fast food worker and cashier, checker would fall within the hypothetical, Your Honor. The janitor, cleaner would not.[55]

A similar argument was recently analyzed by the Eleventh Circuit in *Hurtado v. Commissioner of Social Security,* No. 10-12680, 2011 WL 1560654 (April 25, 2011). In that case, the ALJ limited the claimant's RFC to "simple routine tasks with limited contact with the public" and the vocational expert testified that the claimant could work as a fast food worker. The claimant raised the argument that the DOT described the job of fast food worker as one involving a reasoning level of 2. The Eleventh Circuit noted, "[g]iven the ALJ's hypothetical that Hurtado could perform only simple routine work, the VE believed that Hurtado could perform the fast food worker or mail clerk jobs. . . . And the VE is an expert on the kinds of jobs a person can perform, while the DOT simply provides generalized overviews of jobs and not the specific requirements of a job." *Id.* at *2. The court continued, "[e]ven assuming that an inconsistency existed between the VE's testimony and the DOT, the ALJ did not err by relying on the VE's testimony because it "trump [ed]" any inconsistent provisions of the DOT." *Id.* (citing *Jones v. Apfel,* 190 F.3d 1224, 1229-30 (11th Cir. 1999) (explaining that, if there is a conflict between the DOT and the jobs identified by a VE in response to the hypothetical question, the testimony of the VE "trumps" the DOT because "the DOT is not the sole source of admissible information concerning jobs")).

---

[55] Tr. 73.

A similar result is required here.   The ALJ was entitled to rely upon the unimpeached testimony of the vocational expert. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) (finding that the ALJ may rely on the vocational expert's testimony if the record reflects an adequate basis for doing so even if the vocation expert's testimony conflicts with the DOT).   Further, "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job." *Id.* at 145.  Finally, the Court notes the vocational expert's testimony that Holman could work as a fast food worker is supported by the DOT, which rates a fast food worker as one requiring a reasoning level of 2—"[A] DOT reasoning level of 2 is consistent with a RFC to perform simple, routine, repetitive work tasks." *Charles v. Astrue*, No. 07-1172, 2008 WL 4003651, *4–*5 (W.D. La. Aug.7, 2008).

Next, the Court addresses Holman's contention that the ALJ's finding that she could perform her past relevant work as a cashier/checker is in error because that job is "semi-skilled" in nature and the ALJ found that Holman's RFC limits her to "unskilled" work.   Again, the ALJ is entitled to rely on the testimony of the vocational expert, if the record reflects an adequate basis for doing so, even if the expert's testimony conflicts with the DOT.   *Carey*, 230 F.3d at 146.   However, even if the ALJ's finding that Holman could perform her past work as a cashier/checker is in error, the ALJ's finding that she could perform her past work as a fast food worker was supported by substantial evidence.  Holman's motion for summary judgment on this ground is denied.

## CONCLUSION

The record reveals that the ALJ applied the correct legal standards in the decision at issue and substantial evidence supports the ALJ's determination that Holman is not disabled under the relevant provisions of the Social Security Act. A review of the pleadings and the record on file reflects that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c).

Accordingly, the Court **denies** the Plaintiff's motion and **grants** summary judgment for Defendant.

Signed at Houston, Texas on August ___30___, 2011.

George C. Hanks, Jr.
United States Magistrate Judge